The **UNITED STATES**

v.

**OHIO BARGE LINES.**

**Crim. A. No. 75–240.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Aug. 22, 1975.

Donald E. Walter, U. S. Atty., David R. Lestage, Asst. U. S. Atty., Shreveport, La., for plaintiff.

Donald R. Abaunza, Lemle & Kelleher, New Orleans, La., for defendant.

EDWIN F. HUNTER, Jr., Chief Judge:

The Federal Water Pollution Control Act (WPCA), 33 U.S.C.A. § 1161(b)(4) requires the "person in charge" of a vessel or an offshore or onshore facility to notify the appropriate federal agency when his vessel or facility discharges oil into surrounding water. The Act extends a measure of protection to persons who comply with this requirement. It provides that information obtained by the government in consequence of the mandatory disclosure of oil discharges may not be used "in any criminal case" against the persons who make the disclosure.

The facts are relatively simple. Shortly before March 18, 1974 the barge (OBL–901) had undergone repairs at the shipyard of Barge & Ship Service, Inc. It was delivered to a tug which, in turn, delivered the barge to the Conoco Dock at Lake Charles so that it could be loaded with a product called ALFOL. The product was produced by Continental Oil Company.

On March 18, 1974 the defendant, Ohio Barge Line, Inc., had no employees on the vessel in question or the Conoco Dock. This was the testimony of the Ohio Barge Line witness and all of the Government's witnesses agreed with the testimony. On this day the Conoco personnel began loading the product into the compartments of the barge. At approximately 6:25 P.M. some of the ALFOL leaked from the bow rig compartment and a small quantity (approximately one barrel) got into the water. The testimony was that the cause of the leak was the failure of the shipyard to replace the flange on the deep well pump and to repair the crack in the bow rake compartment which allowed the product to leak into the water. This testimony was uncontroverted.

Following the spill, two calls were made to the Coast Guard to report the incident. One call was made by Mr. Nabours who admitted that his call was on behalf of the vessel as well as Conoco.

The second call was made by Mr. Panzera, an Ohio Barge Line employee. The testimony was that Mr. Panzera's call was made on the evening of the spill and was made without knowledge of Mr. Nabours having called the Coast Guard.

There was no testimony and no indication whatsoever that Mr. Panzera did not make the phone call. As a matter of fact two of the official reports of the Coast Guard admitted that the defendant gave the proper notice to acquire immunity under the statute. The Coast Guard witness readily admitted that he signed the investigation report indicating that Ohio Barge Line had given the proper notice and that the information was true.

The key issue: Is alcohol a hazardous substance for the purpose of Section 311 of the Federal Water Pollution Control Act? If the answer is in the affirmative the defendant must be held to be "not guilty," because there is no evidence against Ohio except that which was disclosed or that flowed from the disclosure by Ohio.

Section 311 of the FWPCA had its genesis in the Water and Environmental Quality Improvement Act of 1970. Section 11 of the Act required polluters to report oil discharges, on pain of criminal sanctions; authorized the Coast Guard to assess a civil penalty on owners or operators of certain polluting facilities; and made the polluter liable for the Government's expenses in cleaning up spilled oil.

Section 12 did not give the Government comparable powers to deal with pollution by hazardous substances. Instead, section 12(g) directed the President to recommend legislation to deal with such pollution. In particular, the President was directed to study enforcement measures, including the same measures that had been provided for oil pollution in section 11:

The President shall conduct an accelerated study which shall include, but not be limited to the method and measures for controlling hazardous substances to prevent this discharge, and the most appropriate measures for (1) enforcement (including the imposition of civil and criminal penalties for discharges and for failures to notify) and (2) recovery of costs incurred by the United States if removal is undertaken by the United States.

The report was submitted to Congress, and on the basis of the report Congress decided to regulate hazardous substances in much the same way as oil. In the Federal Water Pollution Control Act Amendments of 1972, Congress combined some of the provisions of section 11 and 12 of the old FWPCA into the present section 311, 33 U.S.C. § 1321, "Oil and Hazardous Substance Liability." However, oil and hazardous substances were not treated entirely alike. New provisions were inserted at section 311(b)(2)(B), requiring the Administrator of the Environmental Protection Agency, (the "Administrator") to designated whether hazardous substances were removable, and to establish a schedule of penalties ranging up to $5,000,000 to be imposed for the discharge of any hazardous substance determined not removable.[1]

The most important difference between the treatment of oil and that of hazardous substances, however, was that Congress declined to determine what in fact constitutes a "hazardous substance." It directed the Administrator to determine what was a hazardous substance:

The Administrator shall develop, promulgate, and revise as may be appropriate, regulations designating as hazardous substances, other than oil as defined in this section, such elements and compounds which, when discharged * * * present an imminent and substantial danger to the public health or welfare * * *.

(Section 311(b)(2)(A), 33 U.S.C. § 1321(b)(2)(A)).

---

1. A Legislative History of the Water Pollution Control Act Amendments of 1972, Committee on Public Works, 93rd Congress, 1st Session, Serial No. 93–1, p. 1484.

Once a substance was so designated, it would be regulated in much the same way as oil: there would be a duty to report a spill, enforceable by criminal sanctions (section 311(b)(5)); the Coast Guard would assess a civil penalty under section 311(b)(6), and the polluter would be liable for clean-up costs under section 311(f).

■ But until a substance is designated as hazardous by the Administrator, none of the provisions of section 311 apply. Congress emphasized this by inserting in section 311(a) a new definition:

(14) 'hazardous substance' means any substance designated pursuant to subsection (b)(2) of this section.

The Administrator has not exercised his authority to designate hazardous substances. His only action has been to publish proposed rules on hazardous substances in the Federal Register. 39 Fed. Reg. 30465, August 22, 1974. At the time of the alcohol spill in the present case (March 18, 1974), not even this preliminary step had been taken. Thus, at the time of the spill, not only was alcohol not a hazardous substance, there was not even an official proposal to designate it as such. We decline to hold that the provisions of section 311 apply to alcohol.

We hold that Congress understood that section 311 would remain ineffective as to hazardous substances until they had been so designated by regulation. The Committee Report accompanying H.R. 4148 recognized that the effect of this approach would be to leave the bill's provisions entirely ineffective, except as to oil, until the administrative determination was made. In the words of the Committee:

Subsection 17(a)(2) is a general definition of matter which would present an imminent and substantial hazard. The term could extend to more than 200 substances. The Secretary of the Interior is now reviewing a list of over 200 substances to determine what should in fact be held to be hazardous. *Before this subsection can become meaningful, the Secretary will have to*

*issue regulations, following the usual administrative procedures governing such issuance, identifying hazardous matter.* [H.Rept. No. 91–127, reprinted in U.S.Code and Administrative News, 1970, p. 2692; emphasis added.]

■ Our conclusion: alcohol has not been determined to be a hazardous substance; therefore, notification of an alcohol spill does not bring the immunity provision of section 311(b)(5) into play. Ohio Barge Lines is not entitled to any immunity under that section.

We appreciate the seeming inequity of subjecting the defendant to a conviction, where the company's good faith belief that it was hazardous led it to report the spill. But, if we were to perform the Administrator's function by determining that 610 ALCOHOL is a "hazardous substance" within the meaning of FWPCA, it would be a logical second step to determine whether or not the alcohol was removable from water for purposes of the civil penalty. (Civil penalties up to $5,000 or for spills occurring before October 18, 1974, up to $50,000).

We find the defendant guilty and fine the corporation $1,000.00.